IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

GUY BARLOW, ET AL.,

    Plaintiffs,

        v.

UNITED STATES OF AMERICA,

    Defendant.

CIV. NO.: 09-2046(SCC)

OPINION AND ORDER

    Guy and Kim Barlow bring this suit for damages against the United States under the Federal Tort Claims Act. Guy Barlow alleges that as a result of negligent medical care he received while incarcerated at the Metropolitan Detention Center ("MDC") in Guaynabo, Puerto Rico, he now suffers from a severe scar on the base of his penis which has caused him great pain and rendered him impotent, and he seeks damages for these injuries. His wife, Kim Barlow, seeks damages for loss of consortium. A bench trial was held on February 22 and 23, 2012. Below, we set forth our findings of fact and conclusions of law, see Fed. R. Civ. P. 52(a), and find the United States liable for the Barlows' injuries.

1

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

      I.      Findings of Fact

In October 2007, Guy Barlow, recently arrested in the United States Virgin Islands, arrived at MDC for detention pending trial. At that time, he was suffering from a venereal wart in his pubic region, just above the base of his penis. On October 23, the MDC medical staff examined Barlow and, finding the infected wart, prescribed him medications and referred him for a surgical consultation. Records[1] from this period also indicate that Barlow was prescribed three to four changes of dressing to this wart each day.

MDC was aware that Barlow had been suffering from this wart for a number of months, and they knew that he was in need of medical care beyond that which MDC could provide. A notation to his medical records on December 27, 2007, two months after he was referred for a surgical consult, states that Barlow "[n]eed[ed] medical attention ASAP." A notation from the next day, after he had his first surgical consult, states that an evaluation by a urologist was necessary "<u>ASAP!!</u>"[2] Nearly a month after his consult, though, on January 23, 2008, MDC's medical director had not referred him to a urologist.

On January 30, 2008, three months after MDC doctors determined that a

---

1. Guy Barlow's full medical records were marked as a joint exhibit. However, none of the doctors or medical staff that treated Barlow during his incarceration testified at trial.

2. Emphasis in the original.

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

surgical consult was necessary, Barlow was finally referred to a urologist, Dr. Hector Ortiz-Rivera of Hospital Pavia. Dr. Ortiz-Rivera saw Barlow on February 4 and ordered surgery for the next week, on February 12.

By the time of Barlow's surgery, his wart had grown significantly and was ulcerating and fungating. Dr. Ortiz-Rivera made an elliptical incision around the top of Barlow's penis's base and removed the wart. The procedure removed a significant amount of tissue—the wart was about an inch across[3]—and in order to close the incision, Dr. Ortiz-Rivera performed a procedure called undermining, a technique that separates the skin from the muscle beneath it, allowing it to be stretched over the open area. Dr. Ortiz-Rivera then closed the wound with two types of sub-cuticular sutures[4] and covered the affected area with steri-strips.[5]

Barlow's operation ended at noon on February 12, 2008, and by 2:00 p.m. he was back at MDC.[6] Dr. Ortiz-Rivera returned Barlow with a page of orders relating to his

---

3. According to a pathology report from the time of his surgery, Barlow's tumor was 2cm x 1.5cm at the surface and significantly larger below.

4. I.e., sutures made entirely within the tissue plane.

5. I.e., adhesive strips meant to help close small wounds. In Barlow's case, the steri-strips were not the primary method of closing the wound but were instead meant to promote wound healing.

6. Dr. Ortiz-Rivera's post-operative report notes that the surgery ended at noon, and an administrative note in Barlow's medical records from 2:00 p.m. that same day records his return to MDC. See Joint Ex. III, at 22-23. Barlow testified that he was sent directly to his cell upon his return to MDC.

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

post-operative care, the first of which was that he be sent to MDC's "<u>medical ward</u>."[7] Instead, Barlow was placed immediately back in his cell, where he was forced to sleep in an upper bunk and otherwise be physically active. Just after midnight on February 13, Barlow, in pain, hit his cell's duress button and asked to be transferred to a lower bunk. An administrative note in his medical records reflects an order to the unit officer "to provide lower bunk tonight," but according to Barlow he was not in fact moved.[8] Moreover, the day after his surgery, no one from the medical staff came by to clean Barlow's wound, nor did they provide any dressings with which he could do it himself, despite orders from both Dr. Ortiz-Rivera and the medical staff that his wound be cleaned twice daily.

The next day, February 14, 2008, the medical staff provided one cleaning and found no active bleeding but did find ecchymosis.[9] That night, he was moved to a lower bunk. On the 15th, Barlow was taken to the MDC infirmary for the first time, at about

---

7. Emphasis in the original.

8. On this point, we take Barlow's word. Notwithstanding a few apparent inaccuracies, Barlow's testimony struck the court as truthful and credible. Moreover, the administrative note, which in any case is nearly illegible, seems only to say that a move was ordered, not that it was actually done, and the Government presented no affirmative testimony showing otherwise, nor did it cross-examine Barlow on the topic.

9. Barlow's medical expert saw the finding of ecchymosis—essentially, bruising—as portentous, testifying that "at this point, the wound was lost." However, the defense expert testified that ecchymosis is common after surgery, and we agree with him that its presence was not itself dispositive of a worsening condition. That said, based on Barlow's complaints and the totality of the circumstances, it was perhaps a symptom to which the medical staff should have given more attention.

4

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

1:30 p.m., where he was given a dressing change and local wound care. But despite the occasional attention from the medical staff, Barlow was forced to clean his own wound at other times, dressing it with clean socks and underwear because no bandages had been provided.

On the night of the 15th, a Friday, Barlow's wound began to open, and despite his begging and pleas from other inmates, he received no attention from the staff. On Saturday, his condition continued to worsen, and another inmate took pictures of his pubic area. Those photographs, which were introduced into evidence, show a large, open wound surrounded by dried blood and dark, nearly-black skin. No MDC medical staff saw Barlow this day.

On Sunday afternoon, Barlow was finally visited by medical staff, which reported necrotic tissue and a bad, fetid smell emanating from his wound. Cleaning and new dressing was provided, and Barlow's transfer for closer evaluation was discussed but not actually done at this time.[10] A note from the next morning indicates that the corrections officer on duty that night had concerns about Barlow having an open wound in his cell. Local wound care was provided that afternoon, and in the early

---

10. During his testimony, the defense expert testified that Barlow's MDC records from this date reflect his actually being moved for closer evaluation. We disagree. By our reading, the administrative note of February 17, 2008 states only that "[a]rrangements are taking place" to move Barlow for closer evaluation. Moreover, the very next entry in Barlow's medical records shows that he was still in his bunk the next morning. In fact, we can find—and the Government points to—nothing in the medical records showing that Barlow was moved prior to being returned to Pavia for a second surgery.

5

evening, medical staff came by Barlow's cell again. This time, Barlow refused local care and the MDC medical director was notified. The next morning, however, when the medical staff returned, Barlow allowed his wounds to be cleaned. Barlow told the staff at this time that his pain was a seven to nine on a ten-point scale, and the staff reported finding necrotic tissue, swelling, and a foul smell, as well as fecal matter on his upper thighs. That night, Barlow, in "so much pain," again slept in his cell, cleaning his now-open wound himself and dressing it with underwear.

The next day, February 20, 2008, Barlow was rushed by ambulance back to Hospital Pavia, where Dr. Ortiz-Rivera performed a second surgery. Dr. Rivera-Ortiz reported finding hematomas and infection in the wound. During the second surgery, Barlow's wound had to be debrided, and more tissue was removed. As a result, the wound could not be closed by primary intention,[11] as it had been after the first surgery, and was left to close by second intention, which results in more granulation and scarring.[12] After the surgery, Barlow was held for a week at Pavia before being returned to MDC, where he spent six or seven weeks in the medical ward.

---

11. Closing a wound by primary intention involves reapproximating the wound edges so that there is no gap in the tissue which must be closed by processes of epithiliazation and granulation. This technique results in limited scarring. Because of the size of the wound after the second surgery, healing by primary intention was not feasible.

12. Healing by second intention involves no effort to reapproximate the wound edges, and a full-thickness healing process is allowed to proceed by epithiliazation and granulation. Second intention results in significantly more inflammation than does healing by primary intention and involves a greater risk of scarring.

    Curiously, at the time of Barlow's second surgery, Dr. Ortiz-Rivera found no trace of the sutures used at his first surgery. The types of sutures used to close Barlow's wound are meant to last a minimum of several weeks before degrading naturally and being absorbed by the body. But Barlow's second surgery was only eight days after the first, and some sign of his sutures would have been expected to be present. The defense expert attributes the missing sutures to wound manipulation, but we find that Barlow did not manipulate his wound. First, based on Barlow's testimony about his condition and the pain he experienced, as well as our review of the photographs introduced into evidence, we do not believe that Barlow was purposefully aggravating his condition. To the contrary, he seemed concerned about his condition and focused on getting medical attention. Moreover, Barlow's expert testified that, because the sutures were subcuticular, Barlow simply could not have removed them himself. The Government did not cross-examine him on this point, and while the defense expert testified that manipulation caused the missing sutures, he did not directly contradict Barlow's expert's testimony or offer any explanation of the mechanical process by which Barlow could have removed his own sutures. Without such an explanation, we conclude that the lack of sutures was not a result of wound manipulation and that it likely resulted from the wound's dehiscence, infection, or

7

some similar process.[13]

As a result of Barlow's second surgery, severe keloidal scarring occurred at the base of his penis. In addition to this disfigurement and occasional pain, this scarring has also made him effectively impotent: the scarring has resulted in the tightening of the skin in his pubic region, and now, erections so stretch his penile and pubic skin that he experiences excruciating pain. For this reason he can no longer engage in intercourse. Barlow's current condition can only be repaired by plastic surgery, which is estimated to cost at least $40,000 and which would keep Barlow from working for a significant period of time.

After Barlow's release from prison, he reunited with his wife, Kim, in the Virgin Islands. The two had married in 1987 and had two children, but when Barlow fled justice in 1995, becoming a fugitive, the two became estranged for some thirteen years. Each testified that the sole reason for their separation was Barlow's fugitive status, not a real desire to be apart. While on the run, Barlow had other relationships, and he even purported to marry a Dominican national. Moreover, during Barlow's incarceration, it is undisputed that Barlow and Kim did not call or write each other, though they

---

13. As evidence of wound manipulation, the Government's expert also cites a comment by Dr. Ortiz-Rivera speculating that perhaps Barlow's hematomas were caused by masturbation. There is no actual evidence of this in the record, however, as the Government's expert admitted, and we find it an unconvincing explanation. Also cited is an incident in May 2008, several months after Barlow's second surgery, when an MDC physician admonished Barlow to quit touching his healing wound. This proves little and is in any case not evidence of what happened months earlier.

explain that neither had any way of knowing where the other lived. Kim didn't visit Barlow in prison, either, but he testified that he wished no one to visit him there.

Still, after Barlow's release, he returned to the Virgin Islands, where he was joined by Kim and their children. But this effort at reconciliation was hampered by Barlow's impotence, which Kim discovered after arriving in the Virgin Islands. The couple's inability to have sex strained their relationship, and they were unable to share a bed. Eventually, the stress became unbearable and Kim left, returning to the United States, and the children left with her. The Barlows, despite their separation, speak on the phone daily and wish to reunite, but they do not believe that they can do so until after Barlow's condition improves.

II. Conclusions of Law

A. Negligence

Barlow brings suit under the Federal Tort Claims Act. 28 U.S.C. § 1346(b). Under the FTCA, the relevant body of law for determining the United States's negligence is the law of the place where the alleged negligence occurred. Id. Accordingly, we look to Puerto Rico's law of liability for medical malpractice. Vega-Mena v. United States, 990 F.2d 684, 689 (1st Cir. 1993) (applying Puerto Rico law under the FTCA).

In Puerto Rico, medical malpractice liability is fault-based, Martinez-Serrano v. Quality Health Servs. of P.R., Inc., 586 F.3d 278, 285 (1st Cir. 2009), emanating

9

from Article 1802 of the Civil Code. Rodriguez-Diaz v. Seguros Triple-S, 636 F.3d 20, 22-23 (1st Cir. 2011). Article 1802, Puerto Rico's general negligence statute, provides that a "person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. To establish liability, a plaintiff must prove that a duty of care existed, that an act or omission constituting a breach of that duty occurred, and that there was a sufficient causal nexus between the breach and the resulting harm. Martinez-Serrano, 568 F.3d at 285. Physicians in Puerto Rico have a duty to provide their patients with medical care "that, in the light of the modern means of communication and education, meets the requirements generally recognized by the medical profession." Santiago-Otero v. Mendez, 135 P.R. Dec. 540, 1994 P.R.-Eng. 909,224, 1994 WL 909224 (1994).

Physicians are presumed to "observe[ ] a reasonable degree of care." Del Valle-Rivera v. United States, 630 F. Supp. 750 (D.P.R. 1986) (citing Viuda de Lopez v. Puerto Rico, 4 P.R. Offic. Trans. 251 (1975)). The plaintiff must rebut this presumption by "establishing the physician's duty" and showing where the physician deviated from that duty. Rolon-Alvarado, 1 F.3d at 78. In almost every case, expert testimony will be necessary "to determine the applicable standard of care . . . and to make a judgment on causation." Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113 (1st Cir. 2010); see also Rolon-Alvarado v. San Juan, 1 F.3d 74, 77-78 (1st Cir. 1993) (holding that a health care provider "has a duty to use the same degree of expertise as could

10

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances") (citing Oliveros v. Abreu, 1 P.R. Offic. Trans. 293 (1973)).

The testimony of Barlow's expert, Dr. José Ortiz-Feliciano,[14] a general surgeon, as to the proper standard of care was not as clear as it should have been. But while he did not discuss the topic with the precision we would hope for, we find that he testified sufficiently as to the proper course that the MDC medical staff should have taken, not just the course he would have taken personally. Cf. Rolon-Alvarado, 1 F.3d at 78 (holding that plaintiff's expert testimony as to the course of treatment he would have followed was insufficient to establish liability because it did not "establish that a different approach or method, even if unsuccessful, fell short of the duty owed"). Dr. Ortiz-Feliciano's testimony established two primary failings on the part of MDC. The first was its failure to follow Dr. Ortiz-Rivera's post-operative orders and place Barlow in MDC's medical ward. The second major deviation, according to Dr. Ortiz-Feliciano, was MDC's failure to promptly provide medical care as Barlow's condition degraded and his wound dehisced.

Dr. Ortiz-Feliciano testified that MDC's decision to send Barlow back to his cell immediately post-surgery, where he was made to sleep in an upper bunk, did not have regular access to wound dressings, did not receive frequent enough wound cleaning,

---

14. Duly qualified as an expert in surgery and wound care.

11

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

and where he generally had to be as active as a normal inmate, caused his wound's dehiscence. We agree that by not sending Barlow to the medical ward, where he would be more closely attended and more easily able to rest, MDC breached its standard of care. In particular, Dr. Ortiz-Feliciano found that the proximate cause of Barlow's wound's dehiscence was his need to climb in and out of his cell's upper bunk. It is of course impossible to know precisely what caused the wound to begin to fall apart—there may well have been several causes acting together—but Dr. Ortiz-Feliciano's theory is plausible, and it is supported by Barlow's testimony that using the top bunk caused pain to his pubic area. The Government's expert, Dr. José Guzmán-Virella, a urologist,[15] disputes this theory with two primary arguments. First, he says that Barlow was moved out of the upper bunk the first night he returned to MDC post-surgery, and so, he testified, if the climb were the cause of the wound's opening, the problem would have begun to emerge in the next day or two—February 13 or 14, 2008. Instead, his wound did not begin opening until the 15th. The problem with this explanation, however, is that as discussed above, see supra note 8 & accompanying text, Barlow was not moved to a lower bunk the night he returned to MDC. Instead, Barlow spent two nights in an upper bunk and was not moved until the night of the 14th. His wound began opening the next day, on February 15, well within even the Government expert's time frame for damage to occur from a climbing-related injury.

---

15. Duly qualified, after voir dire, as an expert in urology and wound care.

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

Second, Dr. Guzmán testified that because the site of Barlow's surgery was not a flexion point, the physical exertion of climbing to the top of his bunk could not have caused the wound's dehiscence. But Dr. Ortiz-Feliciano testified that even if the suprapubic region is not a flexion point, it is a tension point, and that movements like climbing could still put pressure on the sutures, causing the wound to come apart. We agree with Dr. Ortiz-Feliciano, whose testimony in this regard was supported by Barlow's statements that climbing into the top bunk caused him pain and discomfort.

And though we find that placing Barlow for too long in his cell's top bunk contributed to his wound's dehiscence, we do not think that this finding is essential to establish negligence on this case's facts. This is because MDC further deviated from the proper standard of care by not providing Barlow with sufficiently frequent and competent care during his recovery. Both the operating surgeon, Dr. Ortiz-Rivera, and the MDC's own medical staff prescribed twice-daily wound cleaning and dressings immediately after Barlow's surgery, but attention at this frequency was never provided. Instead, the record reflects that Barlow first received local wound care at sometime before 3:15 p.m. on February 14, more than two days after he arrived back at MDC. Local care was given again a day later, on the 15th. That night, his wound started to fall apart, but he was not seen again by MDC staff until around 3:00 p.m. on February 17—almost two days after his wound had started dehisching—and by this point, the medical staff observed necrotic tissue and a foul-smelling, fetid area. Despite

13

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

this, MDC neither increased the regularity of its attention to Barlow or moved him to the medical ward. Indeed, it was not until early afternoon the next day that Barlow was first seen by a doctor, some six days after returning from Pavia and three days after his wound started opening. By the next morning, Barlow was found in his bunk in extreme pain, with feces on his upper thighs and a swollen, putrid wound.[16] Still, he received no medical care apart from local cleaning.[17] The next day, he was rushed to Pavia with a wound so degraded that healing by primary intention was no longer an option.

On this evidence, we find that, whatever the initial cause of Barlow's surgical wound re-opening, MDC's failure to promptly provide adequate medical care was a breach of the standard of care, and that that breach resulted in his current condition. Dr. Guzmán's testimony tried to show that the medical staff's many minor decisions over the course of eight days were themselves each defensible, exercises of reasonable

---

16. Dr. Guzmán attributed much to the medical staff finding feces on Barlow's body this morning. While he never quite said it, the court assumes that Dr. Guzmán wished to intimate that Barlow had smeared feces all over himself purposefully, we guess to aggravate his condition. Certainly, Dr. Guzmán cited the feces as evidence for his belief that Barlow had "manipulated" his wound. We find this explanation unconvincing. First, as noted by Dr. Ortiz-Feliciano, fecal material may be found in the genital area normally. And second, Barlow was discovered the morning of the 19th in his bunk in extreme pain. It seems to us, then, that a more plausible explanation for any feces found, given his condition, was that the pain he was experiencing made cleaning up after himself difficult or impossible.

17. This cleaning, the last before he returned to Pavia for his second surgery, was only the fifth he received in the eight post-surgical days he spent at MDC.

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

medical judgment. Perhaps some were; to be sure, a mere mistake is not malpractice,[18] but we conclude that the totality of MDC's treatment of Barlow was a breach of an owed duty. His wound was allowed to degrade before their eyes, resulting in a serious disability. Dr. Ortiz-Feliciano testified that draining Barlow's wound on February 16 could have saved him from needing a second surgery. Instead, Barlow went two more days without even being seen by a doctor, and two days after that, a second, more serious surgery was a necessity.

Dr. Guzmán testified that frequent cleaning and dressing of the wound was merely a suggestion, and that the failure to do so regularly was therefore unproblematic. We are sure that there is some room for disagreement between reasonable medical professionals on this point, but in this case, twice-daily cleaning seems to be the proper standard, agreed to by Dr. Ortiz-Rivera, Dr. Ortiz-Feliciano, and MDC's own medical staff. Instead, Barlow went as much as two days between cleanings. Dr. Guzmán argues, then, that medical professionals don't have to do the local wound care and that there was no breach because Barlow could have done it himself. Perhaps if he weren't in prison, but as it was, Barlow lived in a cell at MDC, without access to sterile bandages or much else. And as he testified, he did try to clean

---

18. See Rolon-Alvarado v. San Juan, 1 F.3d 74, 78 (1st Cir. 1993) ("[T]he Puerto Rico Supreme Court has held that even an acknowledged error in medical judgment cannot support a malpractice claim so long as the mistake is reasonable." (citing Oliveros v. Abreu, 1 P.R. Offic. Trans. 293 (1973)).

15

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

and dress his own wound, but his attempts—or failures—to adequately do so with clean underwear does not absolve MDC of its duty.

We find that MDC had a duty to provide Barlow with prompt and continuing care such that his condition did not deteriorate or worsen. MDC failed to adequately do so, and as a result, Barlow is scarred and impotent. We conclude, therefore, that MDC is liable to Barlow for its negligence.

A.   Loss of Consortium

Guy Barlow's wife, Kim Barlow, seeks compensation for the damage done to the Barlow conjugal partnership by MDC's negligence. The Barlows are validly married and lived together after Barlow's release from prison. Because of his condition, they are unable to have intercourse. Moreover, Barlow's inability to have sex has strained their relationship, resulting in a temporary separation.

The Government attempted to cast a shadow over the legitimacy of the Barlows' relationship. The Barlows admitted to having been separated at various points during their long marriage, including for an extended period while Barlow was a fugitive. During this time, Barlow admitted to having a relationship with another woman. The Government further implied[19] that, while Barlow was in prison, neither cared sufficiently to visit, call, or write the other. But the Government's evidence proves little

---

19.   Neither party availed itself of the opportunity to make closing arguments, and so we can only guess at what some of their evidence—and particularly that of the Government—was meant to prove.

16

Barlow v. United States
Civ. No. 09-2046(SCC)
Opinion & Order

and the Barlows gave believable explanations for their actions. Without more, we refuse to engage in speculation about the Barlows' motives or relationship. Finally, the Government offered into evidence tapes of calls Barlow made in prison to a woman he referred to by various terms of endearment. We suppose the Government wishes for us to assume the two were in an extra-marital relationship, but the woman was the wife of Barlow's best friend—and a close friend herself—and their conversations show nothing apart from that fact.[20]

For these reasons, Kim Barlow is entitled to damages as compensation for her loss of consortium. The court's computation of damages, however, takes into account the peculiarities of the Barlows' relationship described above.

III.   Conclusion

The court finds as follows:

1.   Guy Barlow is hereby awarded $200,000 as compensatory damages for his past, present, and future pain, suffering, and emotional distress;

2.   Kim Barlow is hereby awarded $30,000 as compensatory damages for her past, present, and future pain, suffering, and emotional distress as a result of her husband's injury; and

---

20. The Government also offered into evidence some tapes that seem meant to imply that Barlow concocted his whole injury to make money. But where the Government hears avarice, we hear indignation at Barlow's treatment by MDC. Accordingly, we find the MDC tapes of little relevance.

17

3. Plaintiffs are entitled to costs, attorneys' fees, and interests after judgment.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 9th day of March, 2012.

S/ SILVIA CARREÑO-COLL
UNITED STATES MAGISTRATE JUDGE